THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

Carl Robert Nelson,

Plaintiff,  **AMENDED COMPLAINT
AND JURY DEMAND**

vs.

Wachovia Securities, LLC,

Defendant.  Court File No. 07-CV-3162
(DSD/SRN)

As and for his Amended Complaint, Plaintiff Carl Robert Nelson ("Bob Nelson" or "Nelson" or "Plaintiff") states and alleges as follows:

### JURISDICTION AND VENUE

1.      This action arises under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* Jurisdiction is conferred upon this Court by 29 U.S.C. § 2617, 29 U.S.C. § 1132, 28 U.S.C. § 1331, and 28 U.S.C. § 1332. Plaintiff invokes the supplemental jurisdiction of this Court to consider his claims under state law.

2.      Plaintiff asserts claims under the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*, for which jurisdiction is based upon the doctrine of pendent jurisdiction.

3.      The unlawful practices described hereinafter have been committed in the district of Minnesota, the employment records relevant to those practices are, upon information and belief, maintained and administered at the offices of Defendant Wachovia Securities, LLC, in the District of Minnesota. Defendant Wachovia Securities, LLC, conducts business and has offices in Minnesota. Thus, venue is appropriate in Minnesota.

## PARTIES

4.      Plaintiff Carl Robert Nelson is an individual residing in Edina, Minnesota.

5.      Defendant Wachovia Securities, LLC ("Wachovia") is, upon information and belief, a Delaware limited liability company with its principal place of business in Richmond, Virginia.   Wachovia provides brokerage services operating as a registered broker-dealer. Wachovia has numerous employees and offices in Minnesota, including an office in Bloomington, Minnesota, at 8500 Normandale Lake Boulevard, Suite 1710.

6.      During all relevant times herein, Nelson was an "employee" of Wachovia within the meaning of 29 U.S.C. § 2611, 29 U.S.C. § 1002, and Minn. Stat. § 363A.03, subd. 15.

## FACTS

7.      Nelson is a securities broker who was hired by First Union Securities ("First Union") in early 2001, to work in its Bloomington office.   Prior to working at First Union, Nelson worked as a broker at RJ Steichen.

8.      Steve Jensen hired Nelson on behalf of First Union.   Jensen also had come from RJ Steichen and had been involved in a legal dispute with RJ Steichen.   Jensen's recruiting of Nelson led RJ Steichen to threaten further legal action against Jensen for "raiding."   Jensen advised Nelson that First Union would fire Nelson if he (Nelson) did not pay RJ Steichen $50,000 to settle its raiding claims.   Nelson eventually agreed to split the $50,000 settlement cost in order to keep his job.   Nelson paid the entire $50,000 and First Union contractually agreed on August 3, 2001, to repay Nelson half this amount.   Nelson never received any payment under the terms of this contract.

9.      Prior to accepting the offer of employment from First Union, Nelson considered several offers from First Union's competitors.  These competitors offered Nelson a substantially higher ($600,000 higher) signing bonus than First Union, but would not allow Nelson to bring his foreign accounts.  On the other hand, First Union specifically represented to Nelson that he could bring his foreign accounts to First Union, which would allow him to generate greater production and therefore income (than without the foreign accounts).  On April 24, 2001, First Union specifically represented to Nelson in writing as part of its offer of employment that Nelson would be able to bring his foreign accounts with him.

10.     As an inducement to hiring Nelson, First Union gave Nelson a signing bonus of approximately $630,000.  First Union and Nelson entered into a forgivable promissory note whereby the $630,000 was deemed a loan that was forgivable over six years.

11.     Later in 2001, First Union Securities merged with Wachovia.  By operation of law and fact, Wachovia assumed the rights and obligations of the contracts between Nelson and First Union.

12.     In May 2003, Wachovia and Nelson modified the original bonus/promissory note arrangement, extending it an additional eight years (the original term in 2001 was for six years). Nelson signed a modified promissory note for approximately $630,000.  Additionally, Nelson signed a bonus agreement whereby Wachovia would pay Nelson approximately that same amount spread over those same eight years.  Thus, the annual bonuses were approximately equal to the amount due each year on the promissory note.

13.     The May 2003 promissory note indicates that the entire balance is due if Nelson's employment is terminated for any reason or if he incurs a disability under Wachovia's Long-Term Disability (LTD) Plan.  The May 2003 bonus agreement indicates that Nelson must be

3

employed to continue to receive the annual bonus payouts.  However, if Nelson dies or incurs a disability under Wachovia's LTD Plan, Nelson or his estate would receive a lump sum payment equal to the present value of the remaining bonus payments.

14.     As of the time of Nelson's termination, Nelson owed about $431,000 on the promissory note.  If terminated, Nelson would owe Wachovia this amount under the promissory note.  However, if Nelson incurred a disability under Wachovia's LTD Plan, Wachovia would owe Nelson a lump sum amount equivalent to the remaining amount owed under the promissory note.  By terminating Nelson before he could obtain LTD benefits, Wachovia seeks to recoup the $431,000 under the promissory note while avoiding any lump sum bonus payout of that same amount.

15.     Nelson was the top producer in his branch up until the merger between Wachovia and Prudential in July 2003.  After that, Nelson was usually the number one or two producer.  He had reached Premier Advisor status in 2005 and was on course to do it again in 2006 except for a back surgery and subsequent surgery in early 2006.  Nelson was a highly compensated broker and had attained production bonuses each year for his efforts.  He had a high producing successful practice with no complaints from Wachovia or any of his clients.  He had attained the position of Senior Vice President. In the Spring of 2006, Wachovia reneged on its commitment to Nelson that he could maintain his foreign accounts.  Nelson addressed this issue with Wachovia's Chief Executive Officer Dan Ludeman at a videotaped public forum (the Premier Advisor Recognition Conference).  If Nelson had known that he would have been unable to maintain his foreign accounts, he would not have accepted the dramatically smaller bonus that First Union offered when he began his employment and never would have agreed to sign any promissory note related to such a bonus.

16.     On June 22, 2006, Mr. Nelson was thrown off a horse.  He suffered head trauma, multiple fractures and soft tissue injuries.  The full extent of his injuries is not yet known, but the injuries have been severe.  Nelson was not initially aware of the extent of his injuries, but these began to become apparent shortly after the accident.  Nelson's treatment soon included a variety of medications, which affected his mental status.  Nelson began having significant cognitive difficulties.

17.     Nelson's cognitive difficulties were obvious to his supervisor, coworkers and clients as he struggled with the effects of his accident.  Nelson was unable to perform his normal duties.  Despite Nelson's physical and mental situation, his supervisor encouraged Nelson to continue working.  Nelson requested a leave of absence under Wachovia policies and the Family and Medical Leave Act (FMLA) and applied for Wachovia's short term disability (STD) benefits on about July 11, 2006.

18.     On July 12, 2006, Liberty Mutual denied Nelson's STD claim for the first time, asserting that his claim had not been filed within 60 days of his disability (which obviously was not true).  Wachovia's STD Plan is a self-insured plan sponsored by Wachovia, for which Liberty Mutual is the third party administrator.

19.     On July 17, 2006, Nelson attended a doctor appointment.  As a result of this appointment, Nelson concluded that he had no choice but to file a second claim for STD and request a leave of absence under Wachovia policies and the FMLA because he did not feel he could work at all at that point.

20.     Nelson therefore came into the office on July 17 to discuss this with his supervisor, Denise Olson.  In discussing his medical condition with Ms. Olson, Nelson indicated he felt he should go on complete disability leave due to the strong drugs that he was taking.  Ms.

Olson then instructed him to go on full-time disability but then allowed him to remain at the office.

21.     While at the office, Nelson thanked Ms. Olson for correcting a mix-up that had occurred with his phones (someone had rerouted his phone calls without advising him).  Nelson then thanked Betsy Stubson, the Operations Manager, for fixing the phone situation.  Nelson playfully put the fingers of one hand on the side of Ms. Stubson's neck and said, "Please tell me the next time you switch my phones.  I already am losing my mind, please don't make it more difficult," or something to that effect.  Nelson was not angry.  To the contrary, it was obvious he was joking around, which was his well-known style in the office.   The contact was not threatening; it was not sexual.  Ms. Stubson overreacted to Nelson touching her and got upset.  Nelson immediately apologized.  Ms. Olson shortly thereafter told Nelson that Ms. Stubson still was upset, and Nelson immediately went to Ms. Stubson and again apologized.

22.     Ms. Olson thought nothing of Ms. Stubson's complaint at the time.  Ms. Olson advised Nelson that she had touched Ms. Stubson on a previous occasion and Ms. Stubson had gotten upset with her.  Ms. Olson was not fired or disciplined as a result of that incident.  Ms. Olson also told Nelson that she would have thought nothing of his conduct had he done it to her.

23.     Much to Mr. Nelson's surprise, Wachovia shortly thereafter placed him on an administrative leave rather than an FMLA leave.

24.     The next afternoon, July 18, a woman named Lorie Helmuth from Wachovia Human Resources called Nelson to interview him about the incident with Ms. Stubson.  At that time, Nelson indicated to Ms. Helmuth that he was unable to speak with her due to the effect of his accident and/or heavy narcotic medications he was taking.  Ms. Helmuth nevertheless called Nelson again the next morning and interviewed him despite his condition.  Ms. Helmuth was

6

unprofessional to Nelson in the interview and had predetermined that Nelson should be fired. Among other things, Ms. Helmuth asserted that Nelson should be arrested for criminal conduct. Wachovia never has disclosed the extent or results of its investigation into this matter. Wachovia's "investigation" into this situation was biased and incomplete. Wachovia recorded the conversations between Ms. Helmuth and Nelson and, unless destroyed, the recordings will demonstrate the inappropriate conduct of the investigator.

25.    Shortly after this interview by Ms. Helmuth, Liberty Mutual denied Nelson's claim for STD benefits a second time, this time claiming that it had not received sufficient information from Morningside Family Physicians.   Nelson contacted Morningside Family Physicians, which advised him that they had faxed the information to Liberty Mutual on several prior occasions, but immediately faxed the information again.

26.    On August 4, 2006, Craig Dahl, Complex Manager, contacted Nelson and stated that Wachovia was terminating him effective July 17 for failure to comply with company policy, but refused to elaborate.  Mr. Dahl stated that Nelson could resign or he would be fired and demanded an immediate answer.  Nelson indicated he wished to speak to his attorney, and said that he would get back to Mr. Dahl.  Nelson left a voicemail within a half hour for Mr. Dahl indicating that he would resign, but apparently Mr. Dahl and Wachovia could not wait a half hour (despite the fact that this was now several weeks after the July 17 incident).  Wachovia terminated Nelson for actions that "violate firm policy and demonstrated a lack of judgment," according to his Form U5.

27.    Despite terminating Nelson, Wachovia led and continues to lead its employees and Nelson's clients to believe that Nelson is on a leave of absence related to his medical situation.

28.     On October 5, 2006, Liberty Mutual denied Nelson's STD claim a third time, claiming it had insufficient medical information and that Nelson had been terminated for cause. After Nelson complained to the Minnesota Department of Commerce about the denial of his STD benefits, Liberty Mutual approved Nelson's claim on December 19, 2006.  However, it approved benefits for the time period of June 22, 2006 through August 3, 2006 only, and denied benefits from August 4, 2006, forward because Wachovia had indicated to Liberty Mutual that it had terminated Nelson on August 4, 2006 for cause.

29.     Under the STD Plan, employees are not eligible for benefits once they have been terminated.  Similarly, employees are not eligible for benefits under the LTD Plan unless they qualify for STD benefits and have not been terminated.  In Nelson's case, he was not eligible to apply for LTD benefits once Wachovia terminated him.  If Nelson had not been terminated, he would have received STD benefits for the maximum allowable period, and then he would have applied for and obtained LTD benefits until age 65.

30.     A woman named Tamika from Liberty Mutual or Wachovia called Nelson in March 2007 to tell him that he would be receiving STD payments for the June 22 through August 4 period.  Ms. Olson told Nelson's spouse, a Wachovia employee, the same thing earlier the same day.

31.     Despite the approval on December 19, 2006, and the assurances in March 2007, Nelson still has not received any STD benefit payments.

32.     In or around March 2007, Wachovia gave Nelson's spouse a "Workout Agreement and Release" to give to Nelson.  Wachovia created this document before Nelson made any complaint that Wachovia had committed disability discrimination or violated his FMLA rights.  In the Release, Wachovia offered to forgive the balance due on the promissory

8

note over four years, but mentioned nothing about the bonus payout due Nelson if he incurred a disability under the LTD Plan.  Moreover, the balance of the note would not be forgiven once Wachovia no longer retained 80% of Nelson's client assets.  During the period contemplated by the Release, Nelson's client assets certainly will dip below 80% of what it was (assuming, of course, he remains disabled).  In other words, under Wachovia's Release, Nelson would remain liable for the vast majority of the promissory note, he would get none of his bonus payout, and he would have to release all of his legal claims as well.

33.     Because Nelson would not sign Wachovia's illusory and oppressive Release, it has threatened to bring an arbitration action under the auspices of the National Association of Securities Dealers (NASD) to obtain repayment of the promissory note, despite the fact that it unlawfully took away Nelson's income and disability benefits.

34.     As a result of Wachovia's illegal termination, Nelson also has lost his rights to STD and LTD benefits.  Those LTD benefits could have lasted until Nelson reached age 65.  Obviously, this decision to terminate Nelson will cost him – and save Wachovia -- millions of dollars.

35.     At the time of his termination, Nelson was due approximately $78,000 in production bonuses that should have been paid to him under Wachovia's employee handbook.  Despite a demand for payment, Wachovia still has not paid the production bonuses.

36.      Wachovia's wrongful termination and related conduct occurred while Nelson was struggling with tremendous physical injuries.  Nelson's doctors specifically directed him to avoid stress of any type.  The stress directly caused by Wachovia's conduct has set back Nelson's recovery and caused enormous damage to him both physically and mentally.  Wachovia

has caused Nelson substantial medically verifiable and verified mental distress with potentially permanent physical consequences.

## COUNT ONE

### DISABILITY DISCRIMINATION PURSUANT TO MINN. STAT. § 363A.01 *et seq.*

37.     Plaintiff restates and incorporates Paragraphs 1 through 36 above as if fully set forth herein.

38.     On and after June 22, 2006, Nelson has had and continues to have a disability as that term is defined by the Minnesota Human Rights Act, Minn. Stat. § 363A.03, subd. 12.

39.     After Nelson's accident on June 22, 2006, he had an obvious disability, triggering Wachovia's duty of reasonable accommodation under the Minnesota Human Rights Act. Wachovia ignored Nelson's obvious disability and did not accommodate Nelson.  On the contrary, Wachovia urged Nelson to continue to come to Wachovia's offices and to work as much as possible.

40.     After Nelson's accident, he made specific requests for reasonable accommodation, including the taking of a leave of absence.  Wachovia ignored those requests.

41.     If Wachovia had reasonably accommodated Nelson, Nelson would not have been at work on July 17, 2006, he and Ms. Stubson would not have interacted.  Wachovia's failure to reasonably accommodate Nelson constitutes illegal disability discrimination under the Minnesota Human Rights Act.

42.     By terminating Nelson for the incident with Ms. Stubson on July 17, Wachovia treated Nelson differently than similarly situated individuals without a disability, including but not limited to its treatment of Denise Olson.  Such disparate treatment constitutes illegal

disability discrimination under the Minnesota Human Rights Act.  In addition, Wachovia knew Nelson suffered from severe physical and mental condition that affected his behavior, yet terminated him when that condition manifested itself.

43.     Wachovia's purported justification for terminating Nelson was not its true reason and was a pretext for illegal disability discrimination under the Minnesota Human Rights Act.

44.     As a result of Wachovia's violations of the Minnesota Human Rights Act, Nelson has suffered loss of income and benefits, mental anguish, humiliation, embarrassment, loss of reputation, and other damages in an amount to be proven at trial but in excess of $75,000.00.

45.      Wachovia committed these acts with deliberate disregard for Nelson's rights and safety.  As a result thereof, Nelson is entitled to punitive damages under the Minnesota Human Rights Act.  Minn. Stat. § 363A.29, subd. 4.

## COUNT TWO

## FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2601 *et seq.*

46.     Plaintiff restates and incorporates Paragraphs 1 through 45 above as if fully set forth herein.

47.     On and after June 22, 2006, Nelson had a serious health condition as that term is defined by the FMLA.

48.     Nelson made several requests for FMLA leave, before and then on July 17, 2006. Wachovia interfered with Nelson's initial request for FMLA leave by requiring him to work.

49.     Wachovia denied Nelson's requests for FMLA leave.  Instead, it immediately placed Nelson on an administrative leave and subsequently terminated him on August 4, 2006.

50.     Wachovia's denial of FMLA leave to Nelson and its termination of Nelson for exercising his FMLA rights is a violation of the FMLA.  Wachovia interfered with, restrained and denied the exercise of or the attempt to exercise Nelson's FMLA rights.

51.     As a result of Wachovia's violations of the FMLA, Nelson has suffered loss of past and future income and benefits, interest, and other damages in an amount to be proven at trial but in excess of $75,000.00.

52.     Wachovia's violations of the FMLA were not in good faith, entitling Nelson to liquidated (double) damages under 29 U.S.C. § 2617(a)(iii).

## COUNT THREE

### BREACH OF CONTRACT

53.     Claimant restates and incorporates Paragraphs 1 through 52 above as if fully set forth herein.

54.     Wachovia and Nelson have entered into a number of contracts, including but not limited to:

a.     The April 24, 2001, contract between First Union and Nelson allowing him to bring his foreign accounts to First Union and maintain them;

b.     The August 3, 2001, contract signed by Nelson and Jensen;

c.     The employment bonus contract dated May 19, 2003;

d.     The agreement to pay Nelson's production bonuses;

e.     The agreement to pay Nelson's STD benefits; and

f.     Nelson's right to STD and LTD benefits under Wachovia's STD and LTD Plans.

55.     Wachovia has breached the aforementioned contracts.

12

56.     As a result of Wachovia's breach of the aforementioned contracts, Nelson has been damaged in an amount to be proven at the trial, but believed to be in excess of $1 million.

## COUNT FOUR

### PROMISSORY ESTOPPEL

57.     Claimant restates and incorporates Paragraphs 1 through 56 above as if fully set forth herein.

58.     Wachovia has made a number of clear and definite promises to Nelson, as described above.

59.     In making these promises, Wachovia intended to induce Nelson to rely upon them and did induce Nelson to rely upon them.

60.     Enforcement of these promises is necessary to prevent injustice.

61.     As a result of Wachovia's breach of the aforementioned promises, Nelson has been damaged in an amount to be proven at trial, but believed to be in excess of $1 million.

## COUNT FIVE

### EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA)

62.　　Claimant restates and incorporates Paragraphs 1 through 61 above as if fully set forth herein.

63.　　It is unlawful under the Employee Retirement Income Security Act of 1974, as amended, for any person to discharge or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.  29 U.S.C. § 1140.

64.　　Wachovia terminated Nelson in retaliation for his exercise of his rights under Wachovia's STD Plan and for the purpose of interfering with Nelson's rights under Wachovia's STD and LTD Plans.

65.　　As a result of Wachovia's violations of ERISA, Nelson has been deprived of his right to STD and LTD benefits and damaged in an amount to be determined at trial but believed to be in excess of $1 million.

### COUNT SIX

### DEFAMATION

66.　　Claimant restates and incorporates Paragraphs 1 through 65 above as if fully set forth herein.

67.　　On information and belief, Ms. Helmuth and possibly other Wachovia agents made false and defamatory statements within Wachovia regarding Nelson's conduct on July 17.

14

68.     Wachovia terminated Nelson effective July 17, 2006, and completed a form U5 stating that Nelson "engaged in actions that violate firm policy and demonstrated a lack of judgment."

69.     Such false and defamatory statements were made without any privilege and with malice, injuring Nelson's reputation.

70.     Such false and defamatory statements were willfully and intentionally designed to injure Nelson and were made recklessly and in deliberate disregard for Nelson's rights. Wachovia had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Nelson's rights.  Wachovia deliberately proceeded to act in conscious and/or intentional disregard and/or indifference of the high degree of probability of injury to Nelson's rights.

71.     As a result of Wachovia's defamatory statements, Nelson has been damaged in an amount to be determined at trial but believed to be in excess of $1 million.  Nelson also seeks punitive damages against Wachovia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carl Robert Nelson prays for judgment against Defendant Wachovia Securities, Inc., and for the following relief:

1.     For an Order awarding him money damages in an amount to be proven at the arbitration hearing but believed to be in excess of $1 million;

2.     For an Order awarding him all relief available under the Minnesota Human Rights Act, including but not limited to compensatory damages for mental anguish, emotional distress, loss of income and benefits, treble damages and future wage loss, and interest on those amounts,

15

and awarding Plaintiff punitive damages and his attorneys' fees and costs, all in an amount in excess of $75,000.00;

3.      For an Order awarding him all relief available under the Family and Medical Leave Act, including but not limited to lost past and future income and benefits, interest, liquidated damages, and attorneys' fees and costs, all in an amount in excess of $75,000.00;

4.      For an Order awarding him all relief available under the Employee Retirement Income and Security Act of 1974, including but not limited to lost past and future income and benefits, interest, liquidated damages, and attorneys' fees and costs, all in an amount in excess of $75,000.00; and

5.      For such further and other legal or equitable relief as this Court deems just.

Date:  October 3, 2007                    **OBERMAN THOMPSON & SEGAL, LLC**

By   s/ John D. Thompson
        John D. Thompson (#178676)

120 South Sixth Street, Suite 850
Minneapolis, MN  55402
Telephone:  (612) 217-6447
Facsimile:   (612) 217-6444
jthompson@otslawyers.com

**ATTORNEYS FOR PLAINTIFF**

16